# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,
    Plaintiff,

*vs*.

WOODROW DAVIS,                      CRIMINAL ACTION NO. 2:11CR30
    Defendant.

## REPORT AND RECOMMENDATION/OPINION

On the 7th day of December 2011, came the defendant, Woodrow Davis, in person and through counsel Brian J. Kornbrath, and also came the United States by its Assistant United States Attorney, Stephen Warner, for a hearing on Defendant's Motion to Suppress filed on November 23, 2011 [Docket Entry10]. The United States filed its Objection to the Motion on December 6, 2011 [Docket entry 11].

The undersigned received the testimony of Hardy County Sheriff's Deputy Tommie McCausley; received exhibits in evidence; and heard arguments of counsel.

## Procedural History

Defendant Davis was indicted by a grand jury attending the United States District Court for the Northern District of West Virginia on October 18, 2011. The indictment charges him with being a convicted felon in possession of a firearm and of being a drug user in possession of a firearm. [Docket Entry 4]. Defendant appeared before the undersigned United States Magistrate Judge on November 8, 2011, for arraignment, at which time he entered a plea of "not guilty" to all counts.

## Facts

From a totality of the evidence presented [testimony of Deputy T.L. McCausley II and Government Exhibits 1, 2, 3, 4, 5, 6, 7, and 8, admitted in evidence without objection] the undersigned

makes the following findings of relevant facts by a preponderance of the evidence. Accordingly, the undersigned recommends these findings of fact:

1. On and before July 11, 2010 T.L. McCausley II [Deputy McClausley] was a deputy with the Hardy County, West Virginia Sheriff's Department.

2. On July 11, 2010 Deputy McClausley was assigned to duty between the hours of 4:00 pm on July 11th and 2:00 am on July 12th.

3. July 11, 2011 at approximately 4:18 pm Deputy McClausley received notification from 911 to respond to a vehicular accident [accident] on Route 55 in Hardy County, West Virginia on State Route 55. [hearing testimony and Gov't Ex. 5].

4. On arrival at the scene of the accident [approximately 4:21 pm] Deputy McClausley observed a single vehicle located down over left side of the bank with the engine still running and one person entrapped in it, to wit: the driver Woodrow Jefferson Davis [Davis]. [hearing testimony and Gov't Ex. 1, 4 and 5].

5. On Deputy McClausley's arrival at the scene, emergency personnel were in the process of extricating Davis from the vehicle. [hearing testimony].

6. Air transportation [helicopter - life flight] was put on alert and standby at 4:22 and 4:24 respectively [Gov't Ex 4] and arrived at the LZ [landing zone] at 4:59 pm [Gov't Ex. 4].

7. While looking for vehicle and insurance information, Deputy McClausley observed "in plain view" on the driver's side floorboard of the vehicle small metal vial he associated with illegal drug usage. [hearing testimony and Gov't Ex 1]].

8. Inside the vial Deputy McClausley found four (4) small baggies. [hearing testimony and Gov't Ex. 4].

9. While the emergency squad was extracting Davis and readying him for transport to the LZ to be life flighted, Deputy McClausley began taking measurements and photographs as part of his investigation of the accident. [hearing testimony].

10. Deputy Miller, the only other deputy working at the time, was due to go off shift at 4:00 pm. According to the records, he arrived on the accident scene to assist primarily with traffic control after 4:30 pm and stayed on scene until clearing at 4:59 pm. [hearing testimony and Gov't Ex. 7].

11. During Deputy Miller's time on scene, he spoke with Rigglemans, a local towing company, at 4:55 pm. [Gov't Ex 7].

12. Deputy McClausley traveled approximately a mile from the scene of the accident to the LZ [located in Moorefield, WV] to check on Davis at 4:50 pm. [hearing testimony and Gov't Ex. 1, 4, and 5].

13. Deputy McClausley asked Davis if he had anything illegal on him. {hearing testimony and Gov't Ex. 1]

14. In response, Davis handed Deputy McClausley a bag that contained needles, syringes, spoon, lighter and methamphetamine. [hearing testimony and Gov't Ex. 1].

15. It was confirmed that Riggleman towing had the vehicle on its rollback by 4:57 pm. [Gov't Ex. 5]. Deputy McClausley had the vehicle towed from the scene by Riggleman towing and instructed them to impound the same by having a police hold put on the vehicle. [hearing testimony].

16. Davis was transported to the LZ by emergency squad and life flighted from the LZ at 5:08 pm. [Gov't Ex. 4].

17. Davis returned to the accident scene at approximately 5:15 to 5:17 pm and logged in the contraband and noted a BB gun found on the passenger side of the floor of the vehicle. [Gov't Ex. 4 and 5].

18. Deputy McClausley cleared [left] the accident scene at 5:56 pm to answer a series of calls starting with one to 1558 Strawderman Road at 6:27 pm, one to 1250 S. Fork Road at 7:39 pm, one to 110 Rosemary Lane at 8:00 pm, to the Courthouse to do required paperwork at 9:54, and finally to 841 Old Fields Road at 10:03 before clearing to finish paper work at 11:08 before going off shift at 2:00 am on July 12. [hearing testimony and Gov't Ex. 5].

19. Deputy McClausley was aware that the Sheriff's Department had a policy requiring inventories of the contents of motor vehicles seized by police. [hearing testimony].

20. The Hardy County Sheriff's Department written policy on inventories of seized motor vehicles that was in effect on and before July 11, 2010 provides in pertinent part:

"VIII. VEHICLES
B. <u>When warrantless vehicle searches may be performed</u>
    1. Inventories.
G. <u>Inventories of vehicles</u>
    1. The department requires officers to inventory any lawfully impounded vehicle, or a vehicle removed from the street and placed in police custody. Any evidence or contraband found during the inventory may be used to formulate probable cause for a subsequent search or arrest. Vehicles shall be inventoried per departmental procedure which requires an inventory of the entire contents, including closed containers (provided they can be opened without breakage). The purpose of an inventory it to ensure safekeeping of private property and to protect the department from liability. To repeat, in order to justify an inventory of a vehicle, the following conditions must be met:
    a. Officers must have lawful custody of it.
    b. The inventory shall be conducted pursuant to departmental policy.
    c. The scope of the inventory shall be limited to those parts of a vehicle likely to conceal important, hazardous, or valuable items including, but not limited to, the passenger compartment, the trunk, and glove compartment." [Gov't Ex. 3].

21. Deputy McClausley explained he did not do an inventory of the vehicle Davis wrecked before the vehicle was towed and impounded at Riggleman's. [hearing testimony].

22. Deputy McClausley explained he was so busy with the accident scene, other calls, requirements of his job, and did not have help to allow him time to conduct the inventory while the car was at the scene of the accident of at Riggleman's before he went off shift during the early hours of July 12. He also explained that deputies were not paid overtime or for time worked over a shift. He also explained he was aware of Riggleman not having a secure impound lot but Riggleman had the practice of placing impounded vehicles near his residence where two pit bull dogs as well as Riggleman could hear, see and intervene if anyone approached the vehicle while impounded. He also explained he intended to do the inventory later since the vehicle had been towed and impounded and was, in his mind, secured. [hearing testimony].

23. Deputy McClausley explained that, even though the finding and receiving of contraband at the scene made him suspicious there may be contraband located in the vehicle, it was not sufficient to cause him to conduct an inventory at the scene or at Riggleman's before going off shift. [hearing testimony].

24. Deputy McClausley admitted he probably could have carved ten [10] minutes from his time at the accident scene or after to do the inventory but did not do so because it did not seem to be a priority.

25. At approximately 5:30 am of July 12, John Riggleman was stirred to investigate and run off 3-4 people who had gathered around the Davis impounded vehicle and who stated they wanted to get something out of the trunk of the car. After Riggleman refused to let them get anything

from the vehicle and ran them off, they later returned. Riggleman ran them off for the second time and called the police. [hearing testimony and Gov't Ex. 1 and 4].

26. Deputy McClausley received word of the early morning attempt to get in to the vehicle either when he received a call on July 12 or when he turned on his cell phone and retrieved the voice mail message. [hearing testimony].

27. Deputy McClausley went to Riggleman's with a "Vehicle Inventory Record" at 11:15 am on July 12, 2010 to conduct an inventory of the vehicle as required by department written policy. [hearing testimony ad Gov't Ex. 6].

28. It took Deputy McClausley less than ten (10) minutes to conduct the inventory of the vehicle during which he located a 7MM Rifle in the trunk. [hearing testimony and Gov't Ex. 1].

29. Deputy McClausley seized the rifle and completed an inventory of the other non-seized items found in the vehicle. [hearing testimony and Gov't Ex. 1, 2].

30. Deputy McClausley returned to the station from Riggleman's at 1:52 pm on July 12, 2010. [Gov't Ex. 6]

31. Deputy McClausley contacted an BATF officer August 12, 2010 at 2:30 pm. [Gov't Ex. 4].

32. The report signed by Deputy McClausley on July 12, 2010 reflected that he knew at the time he prepared the report that the rifle was in the vehicle that Davis was a "convicted felon and was not supposed to have any firearms." [Gov't Ex. 1] From the records it is likely that he knew of Davis' felony criminal status as early as 5:56 pm of July 11, 2010 as a result of running his driver's licence received from his wallet through the standard CIB check. [Gov't Ex 4, 1 and 5].

Having had the opportunity to observe the demeanor of the witness [Deputy McClausley]

during his testimony, the opportunity to compare his recollections of fact with the documents placed in evidence many of which were prepared by others working in the communications center reporting in real time those things being reported as happening in the field, the opportunity to gage any motivations he may have with respect to the outcome of the hearing before the court, the undersigned finds the testimony of Deputy McClausley "candid"[1] and credible.

## Contentions of the Parties

Defendant contends:

1. Deputy McCausley conducted a delayed inventory search that did not serve governmental interests associated with such a search;

2. The Hardy County Sheriff's Department has no written departmental policy for inventory searches with the exception that they be "conducted pursuant to departmental policy." Other departmental directives require that "warrants shall be obtained to search vehicles, if feasible, unless an emergency exists;" and

3. Deputy McCausley only later conducted an "inventory search" after first receiving a tip of suspicious activity, in contravention of standardized procedures.

The Government contends:

1. Deputy McCausley did not immediately conduct an inventory search due to a shortage of police officers and the necessity that he take care of other important law enforcement matters;

2. Deputy McCausley had intended to perform an inventory search as soon as was reasonably possible, but concedes the need to do so became "more pressing" after he was informed

---

[1] Defense Counsel at one point commented thanked Deputy McCausley for the "candor" with respect to certain testimony he had provided.

individuals desired to break into the vehicle; and

3. The Hardy County Sheriff's Department does have a policy regarding inventory searches.

## Discussion

**A. Relevant Law**

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. In Caroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court recognized that the privacy interests in an automobile are constitutionally protected. This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer. "A warrantless search may nevertheless be valid, and the evidence obtained from that search may be admissible, if the search 'falls within one of the narrow and well-delineated exceptions' to the Fourth Amendment's warrant requirement.'" U.S. v. Matthews, 591 F.3d 230 (4th Cir. 2009).

Vehicle inventory searches are a well-recognized exception to the Fourth Amendment warrant requirement, supported by governmental interests in protecting the owner's property, protecting the police from possible danger, and insuring against false claims against the police. See, e.g., Florida v. Wells, 495 U.S 1 (1990); Colorado v. Bertine, 479 U.S. 367 (1987); South Dakota v. Opperman, 428 U.S. 364 (1987); United States v. Matthews, 591 F.3d 230 (4th Cir. 2009); United States v. Murphy, 552 F.3d 405 (4th Cir. 2009); United States v. Banks, 482 F.3d 733 (4th Cir. 2007); and United States v. Ford, 986 F.2d 57 (4th Cir. 1993). While not dependent on probable cause, however, vehicle inventory searches must be conducted according to standard operating procedure. See, e.g., Wells, supra at 4-5; Bertine, supra at 371-372; Matthews, supra at 235; Murphy, supra at 412-413; Banks,

supra at 738-739. "An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." Whren v. United States, 517 U.S. 806, 811 n. 1, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

In Opperman, supra, the Supreme Court noted "automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities." Id. At 369. Further, "[w]hen vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." Id.

In Bertine, supra, the Supreme Court rejected the Colorado Supreme Court's opinion that a vehicle inventory search was unreasonable because the vehicle had been towed to a secure, lighted facility, stating that "the security of the storage facility does not completely eliminate the need for inventorying. The police may still wish to protect themselves or the owners of the lot against false claims of theft or dangerous instrumentalities." Bertine at 742. The Supreme Court concluded that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." Id. To be valid an inventory search must be conducted in good faith according to standardized criteria, such as a police-department uniform

9

inventory search policy, and this criteria "must curtail the discretion of the searching officer so as to prevent searches from becoming a 'ruse for a general rummaging in order to discover incriminating evidence.'" Banks, supra at 739.

In United States v. Bizzell, 19 F.3d 1524 (4th Cir. 1994) the Fourth Circuit discussed without deciding whether standard operating procedures must be written or whether oral instructions are sufficient. In United States v. Matthews, 591 F.3d 230 (4th Cir. 2009), the Fourth Circuit stated that "The existence of . . . a [standardized criteria] may be proven by reference to either written rules and regulations or testimony regarding standard practices." (Citing United States v. Thompson, 29 F.3d 62 (2d Cir. 1994).

"An officer's suspicion that contraband may be present does not invalidate an otherwise lawful inventory search." Matthews, supra at n.7 (citing United States v. Cox, 955 F.2d 42 (4th Cir.. 1992).

Assuming an inventory search is otherwise proper, law enforcement officers may remove the vehicle and other seized property to another location before conducting the search. See, e.g., Illinois v. Lafayette, 462 U.S. 640 (1983)(upholding delayed inventory search of person and belongings after defendant was transported to police station); Murphy, supra at 412-413 (upholding delayed inventory search of vehicle and its contents after they were towed to Sheriff's Department); and United States v. Colclough, 549 F.2d 937 (4th Cir. 1977)(upholding delayed inventory search of vehicle after it was towed to impound lot.)

**B.      No Written Departmental Policy**

Davis' contention that the Hardy County Sheriff's Department did not have a written departmental policy for inventory searches is without merit.

A written policy existed prior to July 11, 2010. The written policy clearly stated that the purpose of conducting a vehicle inventory was "to ensure safekeeping of private property and to protect the department from liability." These are two of the three recognized governmental interests, to wit: "protecting the owner's property, protecting the police from possible danger, and insuring against false claims against the police." Wells, *supra* at 1 and Whren, *supra* at 811 n.1.

The written policy is mandatory in that it specifically "requires officers to inventory any lawfully impounded vehicle, or a vehicle removed from the street and placed in police custody." It thereby removes discretion from the officer as to whether to do or not do an inventory of a seized and impounded motor vehicle and makes an inventory of such a vehicle a part of the police department's "standard operating procedure." " Wells, *supra* at 4-5; Bertine, *supra* at 371-372; Matthews, *supra* at 235; Murphy, *supra* at 412-413; and Banks, *supra* at 738-739.

While it is true that there is not a written precise step-by-step process as to how to perform an inventory of a seized vehicle outlined in the Department's policy, it does require the following:

1. the officer must have "lawful custody" of the vehicle; and
2. "[t]he scope of the inventory shall be limited to those parts of a vehicle likely to conceal important, hazardous, or valuable items including, but not limited to, the passenger compartment, the trunk, and glove compartment."

The undersigned concludes the above quoted limitations in totality constitute the type of "standardized criteria" referred to in Bertine, *Id*., and certainly acts to "'curtail the discretion of the searching officer so as to prevent searches from becoming a "ruse for a general rummaging in order to discover incriminating evidence.'" Banks, *supra* at 738, 739.

**C.    Delayed Inventory Failed To Serve Governmental Interests**

11

Davis' contention that the conduct of the inventory at approximately 11:15 am on the morning of July 12th is a delay that failed to serve Governmental Interests in protecting itself or the individual's property is without merit.

Would it have been better to have conducted the inventory at the accident scene before the vehicle was turned over to Riggleman for hauling to the salvage yard? Deputy McCausley candidly admitted that it would have been and that he could have carved out 10 minutes to conduct the inventory. However, the undersigned finds the time line of events at the accident scene[2], the lack of available officers to assist and free up Deputy McCausley; the policy of not paying officer's for overtime work; the impoundment of the vehicle at Riggleman's with a hold, the knowledge that Riggleman held vehicles close to his own residence to secure the same, the track record of Riggleman for not having complaints relative to loss or theft from impounded vehicles, militate in support of Deputy McClausley's explanation that he was too busy to do the inventory at the accident scene and did not see an urgency to do one even though he suspected that other contraband may be in the vehicle since he had already seen and seized some found in plain view in the vehicle and geen given other by Davis. The fact of Riggleman's care and track record with regard to impounded or held vehicles militates against conclusion that the failure to search the vehicle at the scene put the valuables in the vehicle at risk and thus negated the rationale behind the inventory exception to the Fourth Amendment prohibition against warrantless searches.

Moveover, the language of the Department policy: "[t]he department requires officer to

---

[2]According to the records Deputy McClausley was at the accident scene and LZ performing his duties a total of 1 hour and 35 minutes [starting 4:21 pm and ending 5:56 pm]. During this time the vehicle was at the scene and available to be searched or inventoried only between 4:21 pm and when it was hauled away at 4:57 pm., a total of 36 minutes.

inventory any lawful impounded vehicle, or a vehicle removed from the street and placed in police custody" envisions that the vehicle be first 1) lawfully seized; 2) be impounded or 3) be removed from the street and placed in police custody. In short, doing the inventory at the scene, while preferable, is not required by the language of the Department policy.

Finally, the law does not recognize a per se rule that delay of the inventory automatically invalidates the search. Lafayette, *supra* at 640 and Colclough, *supra* at 937.

**D.     Tip Of Suspicious Activity Prompted Search**

Davis' contention that the sole reason Deputy McClausley went to Riggleman's on July 12 to conduct the search was because of the suspicious activity surrounding the car earlier that morning as reported by Riggleman is without legal and factual merit.

To reach such a conclusion, the undersigned must ignore the credible and candid testimony of Deputy McClausley to the effect that it was his intent to do the inventory even before he heard of the suspicious activity surrounding the vehicle while at Riggleman's.

There is evidence that on the night of July 11 Deputy McClausley knew Davis was a convicted felon. Even armed with that evidence, he did not search the car at the accident scene or go to Riggleman's salvage yard to search it that night. Even knowledge of Davis' convicted felon status and the contraband seized from Davis and the car at the accident scene was not sufficient to cause Deputy McCausley to search the vehicle for more contraband.

The reason he did not do an inventory at the scene was he was too busy to do one and reasonably thought it could wait until the next day. Deputy McClausley had no idea on the night of the 11th that the trunk of the car contained a rifle which could later be used to prosecute Davis under federal law. In fact, by finding drug related materials on Davis and in the car he wrecked, the deputy

13

had enough to prosecute Davis for a drug charge and the likelihood that there was more drugs hidden in the car would only go to the degree not the nature of the charge.

When the report of suspicious activity at Riggleman's came to his attention during the morning of July 12, it prompted him to get to promptly go to the vehicle in order to protect any property located in it by doing the required inventory. That motivation is just as strong if not stronger than the suspicion that there may be more drug contraband in the vehicle.

The mere fact that Deputy McClausley had suspicion that the car may contain contraband or that the report of activity around the car during the early morning hours of July 12 may have aroused suspicion that the interlopers may have been after contraband does not do away with the need to do a proper inventory to protect any property in the vehicle from theft or the department from any false claim of theft or loss of valuable property. Such suspicion is not sufficient under the facts of this case to invalidate the otherwise lawful inventory search of the Davis vehicle on July 12, 2010. Matthews, *supra* at 230, n. 7; Cox, *supra*, at 42.

Finally, Deputy McClausley filled out and filed a "Vehicle Inventory Record dated July 12, 2010 at 11:30 am. [Gov't Ex. 2]. The record itself shows the doors were locked; the BB gun observed the night before was in the vehicle when inventoried; and noted CD's Bottles and Sunglasses as other items in the vehicle at the time of the inventory. The inventory also notes the condition of the vehicle itself. The Vehicle Inventory Record protects the Hardy County Sheriff's Department from trumped up claims from 11:30 am on July 12, 2010 for the car, its condition as described and its contents as inventoried. It also protects the owner of the car [John Phillips] with respect to the vehicle and the property in the vehicle. The performance of the inventory and preparation of the report militates in favor of the conclusion that the motivation for going to Riggleman's salvage yard on July 12 was to

14

follow departmental policy by doing an inventory of the vehicle and its contents.

## RECOMMENDATION

For the reasons herein stated, it is **RECOMMENDED** that Defendant's Motion To Suppress Evidence [Docket Entry10], be **DENIED**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 12th day of December, 2011.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE